UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ED STRICKLAND and NORTHLAKE MARINE WORKS, a Washington Corporation,

        Plaintiffs,

   v.

CITY OF SEATTLE, *et al.*,

        Defendants.

CASE NO. C08-0454 RSM

ORDER DENYING PLAINTFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' REMAINING FIRST AMENDMENT CLAIM

## I. INTRODUCTION

This matter comes before the Court on the parties' cross motions for summary judgment on Plaintiffs' remaining first amendment claim (Dkt. #21, Dkt. #24). Plaintiffs Northlake Marine Works and its owner Ed Strickland claim that the City of Seattle ("the City") violated their first amendment rights to free speech by compelling Strickland to create a Best Management Practices ("BMP") plan with which he did not agree and by preventing him from including in it a political statement accusing the City of dumping millions of gallons of sewage into Lake Union. The City contends that its requirement was permissible compulsion of private speech pursuant to a regulatory regime, and in the alternative, that the BMP plan

ORDER
PAGE - 1

was government speech not subject to first amendment scrutiny. The parties agree on all material facts.

For the reasons set forth below, the Court agrees with Defendant that the BMP plan was government speech, DENIES Plaintiffs' motion for summary judgment and GRANTS Defendant's motion for summary judgment.

## II.  DISCUSSION

### A. Background

Because the parties have settled all claims except Plaintiffs' first amendment claim, only the facts relevant to that claim are summarized here. Ed Strickland is the owner of Northlake Marine Works, a marina on Lake Union in Seattle, Washington. In August of 2003, he applied for a Master Use Permit from the City to reconfigure his marina's pier. The City's Department of Planning and Development ("DPD") approved an early stage of the permit process and imposed multiple conditions with which Strickland would have to comply to get his Master User Permit and final building permit. One of these conditions stated:

> "A Best Management Practices Plan for Marina Tenants shall be prepared and submitted to DPD. The plan shall include BMPs that will reduce and minimize the impacts of recreational boat storage in the aquatic environment. The system by which tenants are informed of the contents of the plan shall be included with this plan. This plan shall be added to the final plan set prior to final approval."

 (Strickland Declaration, Exhibit 1 at 10).

Although the condition above only says that a BMP plan "shall be prepared and submitted," in practice the City has final approval authority over everything that goes in the BMP plan. As is true in this case, the City makes changes to the BMP or requires the applicant to make changes until the City is satisfied. BMPs are typically distributed to tenants by the marina. The City files a copy of the approved BMP plan in the "final plan set," the set of records associated with the building permit.

To comply with the BMP condition, in June 2005 Strickland sent a proposed BMP plan to the DPD through his consultant, Alan Foltz. Margaret Glowacki, The City's Land Use Planner who reviewed Strickland's BMP plan, found it to be defective in several ways. On

December 9, 2005, she e-mailed Foltz and told him that she had received the BMPs for another marina, the Shilshole Bay Marina, and would like him to take "everything that is appropriate for Mr. Strickland's site and tenants" from the Shilshole BMPs and put it into Strickland's BMP plan. (Glowacki Declaration, Exhibit F). In clearing up an apparent confusion about the status of the BMP plan later that day, Glowacki informed Foltz that the BMPs he submitted "were not clear on a number of issues." (*Id.*). She told him that "[t]he quickest way to resolve this issue is to use Shilshole's BMPs because it is clear and addresses water quality and the appropriate BMPs." (*Id.*).

Glowacki had obtained the Shilshole Bay Marina's BMP plan through her ownership of a sailboat at the Shilshole marina, not through her employment with the City. As it turns out, the Shilshole Bay Marina BMP plan was voluntary and had never been part of the City's approval process. This Shilshole Bay plan contained the following opening paragraph, which is the main contributor to the issues of this case:

> "The Port of Seattle and Shilshole Bay Marina are committed to preserving and enhancing the environment through proper management of all activities that occur at this facility. Given this commitment and in accordance with the Department of Ecology rules, United States Coast Guard regulations, and the Federal Clean Water Act, we have established these Best Management Practices in the hope that they will ensure the continued safekeeping of our harbor and marine environment. Marina staff are available to assist customers 24 hours/day, 7 days/week. Shilshole Bay Marina has been named an 'EnviroStar Business,' earning the highest five-star rating for preventing pollution and reducing hazardous waste."

(Glowacki Delcaration, Exhibit E at 1).

Strickland, already frustrated with the City for the delay in handling his application and for other reasons, misunderstood Glowacki's instructions. He thought that Glowacki wanted him to incorporate this opening paragraph into his BMP plan and change references to "The Port of Seattle" to "The City of Seattle." He rewrote the paragraph making that substitution and substituting "Lake Union" for the harbor. Then, to get his tenants' attention and tell them about what Strickland believed to be a serious problem, Strickland appended to the end of the paragraph the sentence, "This is in contrast to the City practice of dumping billions of gallons

of sewage and storm water run off [sic] into Lake Union." (Strickland Declaration, Exhibit 8 at 1). Strickland's proposed opening paragraph then read:

> "The City of Seattle is committed to preserving and enhancing the environment through proper management of all activities that occur at this facility. Given this commitment and in accordance with the Department of Ecology rules, United States Coast Guard regulations, and the Federal Clean Water Act, the City have established these Best Management Practices in the hope that they will ensure the continued safekeeping of Lake Union. *This is in contrast to the City practice of dumping billions of gallons of sewage and storm water run off into Lake Union*."

(*Id.* (emphasis added)).

Glowacki objected to this paragraph for two reasons. First, she noted that it did not make sense as written because the "City of Seattle" could not exercise "proper management" of the marina because the City was not the manager. Second, she objected to the sentence concerning the sewage runoff because she did not know whether it was true and because she thought it might subject the City to liability. Glowacki decided to revise the paragraph. She e-mailed Foltz and stated:

> "I will revise it to read:
>
> The Northlake Marina is committed to preserving and enhancing the environment through proper management of all activities that occur at this facility. Given this commitment and in accordance with the Department of Ecology rules, United States Coast Guard regulations, and the Federal Clean Water Act, the Northlake Marina has established these Best Management Practices in the hope that they will ensure the continued safekeeping of Lake Union."

(Strickland Declaration, Exhibit 9 at 1).

Strickland did not want to remove his political statement regarding sewer runoff. For many months, he and the City were at an impasse. Eventually, Strickland filed a BMP plan including the substantive management practices from the Shilshole BMPs, but with no opening paragraph and therefore no political statement. The city approved that BMP plan

and eventually issued Strickland a building permit. Strickland later filed suit claiming that the City violated his first amendment right to free speech when it refused to allow him to include his political statement regarding the City's sewer runoff into the BMP plan.

**B. Standard of Review**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The parties agree upon the material facts in this case and each argues that it is entitled to judgment as a matter of law.

**C. Compelled Speech**

Strickland first argues that the City violated his first amendment right by compelling him to "disseminate the City's message." He cites a long line of Supreme Court cases which hold that it violates the first amendment for the government to compel a private citizen to speak a message with which he disagrees. *See Hurley v. Irish-American Gay, Lesbian and Bi-sexual Group of Boston*, 515 U.S. 557 (1995); *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988); *Pac. Gas and Electric Co. v. Pub. Utils. Comm'n of California*, 475 U.S. 1 (1986); *Wooley v. Maynard*, 430 U.S. 705 (1977); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974). For example, in *Wooley*, the constitutionality of a New Hampshire statute requiring that the state's motto, "Live Free or Die," be displayed on all state license plates was challenged on first amendment grounds. The plaintiff, Wooley, objected to the requirement that he display the state's motto because he felt it conflicted with his religious, moral, and political beliefs. The Court held that the government cannot force individuals to "use their private property as 'mobile billboards' for the State's ideological message." *Wooley*, 430 U.S. 705 at 715. Here, Strickland argues that by compelling him to create a BMP plan and distribute it to his tenants and at the same time controlling the contents of the BMP plan, the City is effectively putting words in his mouth in the same way that New Hampshire forced Wooley to speak its motto.

The City first argues that its BMP requirement is authorized by the Ninth Circuit's decision in *Environmental Defense Center, Inc. v. U.S. Environmental Protection Agency*, 344 F.3d 832 (9th 2003). In that case, the Ninth Circuit upheld an EPA requirement that small municipal sewers distribute educational materials to the community concerning the impacts of stormwater discharges into water bodies. Central to its holding that the requirement did not violate the compelled speech doctrine was that the EPA's distribution requirement was "broad," did not "dictate a specific message," and did not require any "specific speech at all." *Envtl. Defense Center*, 344 F.3d 832 at 849. The present case, however, is distinguishable because the City exercises full approval authority over the BMPs and thus can require specific speech, or as here, require that specific speech be removed. Therefore, *Environmental Defense Center* is inapplicable.

The City's second argument is more persuasive. It argues that because the City has full control of the contents of the BMPs through its final approval authority, the BMPs constitute government speech rather than private speech and are therefore not subject to the first amendment. *See Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny."); *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229 (2000) (A government entity has the right to "speak for itself").

In *Pleasant Grove City v. Summum*, the Court held that when a city denied a request by a private organization to put a donated monument in a public park that contained other privately donated monuments, it did not violate the organization's first amendment rights because monuments in a public park are government speech. 129 S.Ct. 1125 (2009). The Court explained that even though the monuments were designed and built by private citizens, the city "'effectively controlled' the messages sent by the monuments in the Park by exercising 'final approval authority' over their selection." *Id.* at 1134 (quoting *Johanns*, 544 U.S. 550 at 560-61).

In *Johanns*, a collection of "high-end" beef producers challenged a federal statute requiring them to pay assessments that were then used to finance advertising for generic beef.

The Court held that the advertisements were government speech even though the Operating Committee that designed the ads was a nongovernmental entity. It explained, "When, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages." *Johanns*, 544 U.S. 550 at 562.

These decisions control the present case.[1] Although the City solicited Strickland's help in providing BMPs specific to his marina, every word of the BMP plan had to be approved by the City. When Strickland tried to add even one sentence to the BMP plan that the City did not approve of, the City rejected it. Strickland cannot claim that the BMP plan was his own private speech when the government had complete control over its contents.

Strickland argues that even if the ultimate message is the City's, he is unconstitutionally being forced to associate with that message. Importantly, the Court in *Johanns* noted that there may have been, "on some set of facts," an as-applied challenge to the beef advertisements if the advertisements were attributed to the plaintiffs, and declined to express an opinion on the matter. *Id.* at 565. Justice Thomas, concurring in the judgment, stated:

> "The government may not, consistent with the First Amendment, associate individuals or organizations involuntarily with speech by attributing an unwanted message to them, whether or not those individuals fund the speech, and whether or not the message is under the government's control. This principle follows not only from our cases establishing that the government may not compel individuals to convey messages with which they disagree, but also from our expressive-association cases, which prohibit the government from coercively associating individuals or groups with unwanted messages."

*Id.* at 568 (Thomas, J., concurring) (citations omitted).

Along the lines of Justice Thomas's reasoning, it seems clear that if the City forced the final BMP plan to be attributed to Strickland, that would violate the first amendment. To hold otherwise would lead to the illogical result that a government exercising some

---

[1] The Ninth Circuit has adopted a non-exhaustive four-factor test to distinguish between private speech and government speech. Because the decision in this case is compelled by *Summum* and *Johanns*, the court does not apply the four-factor test here. However, were the court to apply the test, the outcome would be the same.

ORDER
PAGE - 7

censorship over private speech violates the first amendment, while a government exercising comprehensive and total censorship escapes first amendment scrutiny altogether by transforming private speech into government speech.

But that is not what happened here. Strickland argues that the BMP is attributed to him because it says "Northlake Marine Works Best Management Practices" on every page and does not say anywhere on its face that the government approved it. However, this does not establish attribution; the title tells the reader to which marina the best practices apply, not who is responsible for writing them. More importantly, there is no evidence indicating that Strickland could not have dispelled any notion that he might be associated with the City's BMP plan, perhaps by including a statement in the plan that its contents were subject to the City's approval and regulations. Thus, to the extent there is any ambiguity about who is responsible for the BMP that might lead somebody to attribute it to Strickland, that attribution was not *compelled* by the city and was completely avoidable. At one point, Glowacki revised Strickland's BMP plan to say that "Northlake Marina has established these best practices . . . ." But this attribution was not compelled, since the record clearly demonstrates that Strickland's final approved BMP, which contained no opening paragraph at all, did not contain this language.

Strickland also argues that he was forced to associate with the City's message by distributing the BMP to his tenants. But simply delivering a government regulatory document to tenants does not imply association with its contents. Moreover, the record indicates that Strickland was not compelled to deliver the BMP to his tenants himself but merely was required to propose a way to inform his tenants of the plan.

As a practical matter, most people who submit BMPs to the City do not mind attribution to them or association with them because they agree with the contents of the final approved version since both the City and marina owners have an interest in preserving the quality of water bodies.[2] But to the extent a marina owner disagrees with the City's message, there is

---

[2] *See, Envtl. Def. Ctr.*, 344 F.3d 832, 850 (noting that it is "fair to presume" that regulated municipal sewers "will agree with the central message of a public safety alert encouraging proper disposal of toxic materials.").

ORDER
PAGE - 8

no indication that the City compels attribution or association. Because the evidence does not indicate that the City compelled Strickland to associate himself with the BMP plan, the City did not violate Strickland's first amendment rights.

**D. Content and Viewpoint Discrimination**

Strickland argues that the City exercised content and viewpoint discrimination in violation of the first amendment by not allowing him to include in the BMP a sentence stating that the City was a major polluter of Lake Union. Because the BMP is government speech and not Strickland's private speech, as explained above, the City can choose to include or not include whatever it wants. The government can "speak for itself." *Southworth*, 529 U.S. 217, 229.

### III. CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Plaintiffs' Motion for Summary Judgment on the Remaining Free Speech Claims (Dkt. #21) is DENIED.

(2) Defendant's Motion for Summary Judgment on the Remaining Free Speech Claims (Dkt. #24) is GRANTED.

(3) The Clerk is directed to forward a copy of this Order to all counsel of record.

DATED this 9th day of September, 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE